# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

ADELYN A. FERRIN,

        Claimant,

vs.

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

No. 19-CV-4010-LLR

**REPORT AND
RECOMMENDATION**

_____

Plaintiff Adelyn A. Ferrin ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the District Court **affirm in part and reverse and remand in part** the Commissioner's decision.

## I.     BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 9) and only summarize the pertinent facts here. This is an appeal from a denial of supplemental security insurance benefits ("SSI"). Claimant was born on November 7, 1973. (AR[1] at 188.) Claimant is a high school graduate. (*Id.* at 223.) She allegedly became disabled

_____

[1] "AR" cites refer to pages in the Administrative Record.

Case 5:19-cv-04010-LRR-MAR    Document 16    Filed 04/08/20    Page 1 of 38

due to a back injury, a foot injury, chronic obstructive pulmonary disease ("COPD"), asthma, and complex regional pain syndrome ("RSD").[2] (*Id.* at 260.) Claimant's original onset of disability date was January 1, 2015. (*Id.* at 118.) Claimant filed an application for SSI on May 13, 2016. (*Id.* at 10.) Her claim was denied originally and on reconsideration. (*Id.* at 106-09, 118-22.) A video hearing was held on April 30, 2018 with Claimant and her attorney, Willie Hamilton, in Spencer, Iowa and ALJ Hallie E. Larsen in Fargo, North Dakota. (*Id.* at 29-56.) Vocational Expert ("VE") Jonathan Nusbaum appeared by telephone. (*Id.* at 30.) Claimant and the VE testified. (*Id.* at 32-55.) The ALJ issued an unfavorable decision on July 3, 2018. (*Id.* at 7-22.)

Claimant requested review and Appeals Council denied review on January 22, 2019. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On March 22, 2019, Claimant timely filed her complaint in this Court. (Doc. 1.) On November 4, 2019, all briefing was completed. On November 5, 2019, the Honorable Linda R. Reade referred the case to me for a Report and Recommendation.

## II. *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

---

[2] RSD is ". . . a long-term (chronic) pain condition that can affect any area of the body, but often affects an arm or a leg." NIH, National Library of Medicine, https://medlineplus.gov/ency/article/007184.htm.

is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the

ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

4

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id*. §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.    *The ALJ'S Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset of disability date. (AR at 12.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: COPD; asthma; degenerative disc disease of the lumbar spine, status post two surgeries; obesity; degenerative joint disease of the right knee; history of foot fracture and arthritis; residuals of a cat bite; and major depressive disorder. (*Id.*) The ALJ found Claimant's incontinence to be a nonsevere impairment. (*Id.*)  The ALJ evaluated Claimant's claims under listings 1.02A and 1.02B (major disfunction of a joint due to any cause); 1.04A (disorders of the spine with evidence of nerve root compression), 3.02 (certain respiratory disorders); and 12.04 (depressive, bipolar and related disorders). (*Id.* at 13.) When crafting the RFC, the ALJ also considered the effects of Claimant's obesity on her impairments. (*Id.* at 17.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.*)

At step four, the ALJ found that Claimant had the following RFC:

[T]he claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 416.967(a) except: [T]he claimant is limited to lifting 10 pounds occasionally and less than 10 pounds frequently. The claimant is limited to sitting (with normal breaks) for about 6 hours out of an 8-hour workday. The claimant is limited to standing or walking (with normal breaks) for about 2 hours out of an 8-hour workday. The claimant is limited to frequent handling and fingering bilaterally. The claimant is limited to never climbing ladders, scaffolds or ropes. The claimant is limited to occasional balancing (as defined in the SCO), stooping, kneeling, crouching, crawling and climbing ramps or stairs. The claimant is limited to tolerating only occasional exposure to work around hazards such as unprotected heights and dangerous moving machinery. The claimant is limited to tolerating only occasional exposure to extreme cold or heat, fumes, odors, dusts, gases and poor ventilation. Mentally, the claimant is limited to understanding, remembering and carrying out short, simple instructions. The claimant is limited to responding appropriately to work pressures in a usual work setting. The claimant is limited to responding appropriately to changes in a routine work setting.

(*Id.* at 14.) The ALJ further found Claimant was unable to perform any of her past relevant work. (*Id.* at 20.)

At step five, the ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could perform, including surveillance system monitor, order clerk, and credit clerk. (*Id.* at 21.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*)

## B.     *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted).

The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to fully and fairly develop the record regarding her RFC and (B) failing to resolve the conflict between her RFC and the reasoning level requirements of the jobs the ALJ relied on to deny benefits at step 5. Claimant further argues the ALJ was not appointed in a constitutional manner. Thus, she argues the ALJ's decision must be vacated and Claimant's case remanded so a properly-appointed ALJ may adjudicate the claim.

7

**A.**     ***The ALJ fully and fairly developed the record regarding Claimant's physical RFC.***

The "social security hearing is a non-adversarial hearing, and the ALJ has a duty to fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). The ALJ bears this responsibility "independent of the claimant's burden to press [her] case" and it extends to cases where claimants are represented by counsel at the administrative hearing. *Stormo*, 377 F.3d at 806. However, the Eighth Circuit has held:

> Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

*Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). The inquiry is whether the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.3d 1232, 1234 (8th Cir. 1993). Absent unfairness or prejudice, remand is not required. *Id.* (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir.1988)). The ALJ must determine a claimant's RFC "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000) (alterations in original)).

"Because [a] claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citation omitted). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Id.* (citing *Myers*, 721 F.3d at 526-27) (affirming RFC without

medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same)). "In the absence of medical opinion evidence, 'medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.'" *Hensley*, 829 F.3d at 932 (alteration in original) (quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)).

Although Claimant bears the burden to "provid[e] the evidence [the ALJ] will use to make a finding about [Claimant's] residual functional capacity," the ALJ is "responsible for developing the claimant's complete medical history." 20 C.F.R. § 404.1545(a)(3) (2019). "The ALJ's obligation to develop the record 'is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.'" *Coleman v. Colvin*, No. 13cv1004 EJM, 2013 WL 4069523, at *2 (N.D. Iowa Aug. 12, 2013) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)); *Martin v. Berryhill*, No. 1:18-CV-00004 JM/PSH, 2019 WL 138655, at *6 (E.D. Ark. Jan. 8, 2019) (explaining that "the ALJ must weigh the various medical opinions in the record") (citation omitted), *R. & R. adopted*, 2019 WL 334202 (E.D. Ark. Jan. 25, 2019). "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." SSR 96-4p.

Claimant argues that the ALJ did not fully and fairly develop the record regarding her physical RFC. Specifically, Claimant asserts that the ALJ should have obtained a treating or examining physician's opinion "concerning Ms. Ferrin's limitations during

the period her conditions worsened" and after the state agency consultants rendered their opinions. (Doc. 12 at 9.) Claimant asserts that because "the ALJ's RFC lacked sufficient medical opinion input, . . . [it is] an example of an ALJ 'playing doctor' while determining a claimant's limitations." (*Id.*) Claimant takes issue with the fact that the state agency consulting physicians rendered their opinions on September 24, 2016 and November 22, 2016 (AR at 83-85, 98-100), but that she sustained a back injury on February 7, 2017 that resulted in worsened back pain. (Doc. 12 at 8.) The state agency consultants were the only physicians who provided opinion evidence related to Claimant's physical limitations. However, because their opinions do not address Claimant's later-developed impairments, Claimant argues that no opinion addresses her impairments. Claimant also asserts that she developed hand tremors in July 2017 that the ALJ incorrectly stated began in December 2017. (Doc. 14 at 3.) These tremors, Claimant argues, would last for at least twelve months, and therefore should be considered a disabling condition. (*Id.*)

The Commissioner responds that despite Claimant's allegations that her symptoms worsened in February 2017, she had "largely unremarkable examination findings from that point onward" and that the medical evidence, Claimant's testimony, and Claimant's disclosures support the ALJ's decision. (Doc. 13 at 10-14.) The Commissioner argues that Claimant's case is distinguishable from *Hutsell v. Massanari*, 259 F.3d 707 (8th Cir. 2001), upon which Claimant relies in part, because in *Hutsell* the court found there was "no medical evidence" to support the ALJ's RFC, but in the case at bar, there was sufficient medical evidence in the record to support the ALJ's decision. (*Id*. at 9) (citing *Barrows v. Colvin*, No. C13-4087-MWB, 2015 WL 1510159, at *9 (N.D. Iowa Mar. 31, 2015)). The Commissioner argues that "[a]bsent a medical opinion, a court should still affirm an ALJ's decision when, as here, it rests on medical evidence sufficiently

supportive of the ALJ's findings." (*Id.* at 10 (citing *Barrows*, 2015 WL 1510159, at *9).)

The state agency medical consultants determined that Claimant could engage in a range of light work. (AR at 19.) The ALJ rejected that finding, however, because "evidence admitted at the hearing level . . . [showed] the claimant was more limited than originally determined. Additionally, the State agency medical consultants did not have access to the full longitudinal record through the hearing date and did not have the advantage of seeing the claimant testify to her subjective complaints." (*Id.*) The ALJ therefore assigned the opinions little weight. (*Id.*) Accordingly, the ALJ did not rely to a great extent on the consultants' opinions when she decided the case. She did, however, cite extensively to the medical evidence and to the record as a whole to support her decision. (*Id.* at 13-19.)

Claimant presented to the emergency room on February 7, 2017 after twisting and feeling a "pop" in her back. (AR at 639.) Claimant rated her back pain at 10/10. (*Id.*) Claimant's examination results were normal, with no weakness and 5/5 strength and normal muscle tone and range of motion. (*Id.* at 643.) Claimant was diagnosed with a paraspinal muscle spasm. (*Id.* at 644.) Claimant told the Social Security Administration ("SSA") in March 2017 that her back pain had gotten worse. (*Id.* at 267.) However, Claimant did not seek medical treatment for back pain again until August 18, 2017. (*Id.* at 683.) Dr. Grant Shumaker noted he had last seen Claimant in November 2016 after a fall, that Claimant was "status post pedicle screw fusion L4 to S1 ALIF in February 2016," and that Claimant was currently complaining of pain that had been progressing over three months, was worse with bending and twisting, and radiated into both legs. (*Id.*) On examination, Claimant had normal gait and station; full range of motion with no instability; normal strength in her neck, arms, and legs; and intact sensation to light touch. (*Id.* at 684.) Straight leg raise testing was negative for back pain. (*Id.*) In spite

11

of these normal results, Dr. Shumaker noted that Claimant's symptoms were "suspicious for adjacent segment failure L3-4" and ordered MRI imaging and lumber flexion and extension x-rays. (*Id.*) Claimant's MRI results showed persistent neural foraminal compromise[3] at L4-L5, severe on the right and moderate on the left. (*Id.* at 638.)

Claimant returned to Dr. Shumaker on September 15, 2017 complaining of back pain and a left-hand tremor that had developed over the past two months. (*Id.* at 679.) On examination, Claimant had normal gait and station; full range of motion with no instability; normal strength in her neck, arms, legs; intact sensation to light touch; and twitching of the left second finger. (*Id.* at 680.) Dr. Shumaker planned to proceed with intra-articular facet injections at L3-4, and a possible trial of spinal cord stimulation. (*Id.*) Dr. Shumaker referred Claimant to a neurologist for evaluation of her left-hand tremors. (*Id.*) Dr. Shumaker performed intra-articular facet injections on October 6, 2017. (*Id.* at 627.)

Claimant saw neurologist William J. Andrews on December 14, 2017 concerning her left-hand tremors. (*Id.* at 670-72.) Claimant told Dr. Andrews that she had symptoms every day, multiple times a day, and that she could not discern any consistent precipitating factors. (*Id.* at 670.) Claimant's strength examination yielded normal results. (*Id.* at 671-72.) Dr. Andrews ordered a brain MRI. (*Id.* at 672.) Claimant never had the MRI. (*Id.* at 659.) Claimant returned to Dr. Andrews on February 22, 2018 reporting that her tremors had increased in frequency and severity. (*Id.*) Dr. Andrews reviewed the results of Claimant's EMG test, which showed minimal carpal tunnel syndrome, which Dr. Andrews did not believe contributed to Claimant's tremors.

---

[3] Foraminal compromise means "spinal stenosis," which is "narrowing of the spinal column that causes pressure on the spinal cord, or narrowing of the openings (called neural foramina) where spinal nerves leave the spinal column." NIH, National Library of Medicine, https://medlineplus.gov/ency/article/000441.htm.

12

(*Id.* at 661.) Dr. Andrews did not find any evidence consistent with Parkinson's disease. (*Id.*) He started Claimant on Primidone. (*Id.*)

At the hearing on April 30, 2018, Claimant testified that she is 5'-1" tall and weighs 265 pounds, uses a cane or a walker all the time for ambulation and that, although these assistive devices had not been prescribed by her physicians, the cane had been recommended about three years ago by Dr. Shumaker and "a foot doctor, Dr. Crampton." (*Id.* at 32-33.) She further testified that she has difficulty dressing herself from the waist down and can only stand or sit for 15 minutes at a time before having to lie down to take pressure off her back and knee. (*Id.* at 34-35.) Claimant stated that she cannot even walk one block. (*Id.* at 37.) Claimant is awaiting final approval for a spinal cord stimulator to help reduce her back pain. (*Id.* at 42.) She also testified that due to hand tremors, she no longer cross-stitches and paints like she used to because she "can't hold anything steady." (*Id.* at 39.)

Claimant testified that she is limited to helping with dishes for a few minutes and that now that her children are 12 and 15, they help her with laundry and they pick up after themselves as best they can. (*Id.* at 38.) Claimant further testified that her husband generally cooks dinner. (*Id.*) This testimony was consistent with the adult function report Claimant completed on October 24, 2016 in which she stated she cooks only simple meals and does household chores but does not do "major big cleaning." (*Id.* at 247-54.) In that report, Claimant also stated that she not only needs help getting dressed from the waist down, but also that she never bathes alone, cannot shave her own legs, and sometimes has problems toileting independently due to back pain. (*Id.* at 248.) Claimant also stated that she shops in stores when she needs ten or fewer items and that her husband does the big shopping trips. (*Id.* at 250.) Claimant socializes on the phone, the computer, and in person about once-a-month and attends her children's extra-curricular activities when she is able to do so. (*Id.* at 38, 252.) For recreation, she watches television, cross

stitches, and paints, although, as already mentioned, she testified that her recent hand tremors prevent her from cross-stitching and painting.  (*Id.*)

Claimant relies on *Combs v. Berryhill*, 878 F.3d 642 (8th Cir. 2017) to argue that "[b]ecause there are no medical opinions concerning Ms. Ferrin's limitations during the period her conditions worsened, the ALJ's RFC lacked sufficient medical opinion input and was an example of an ALJ "playing doctor" while determining a claimant's limitations."  (Doc. 12 at 9.)  In *Combs*, the court held that the ALJ did not fulfill his duty to fully and fairly develop the record because the ALJ relied "on his own inferences as to the relevance of the notations 'no acute distress' and 'normal movement in all extremities' [in treatment notes] when determining the relative weight to assign" state agency physicians' opinions.  878 F.3d at 647.  On appeal, the Commissioner conceded that "no acute distress" was "of no particular significance with a chronic condition" such as the claimant's.  *Id.*  The record in the case contained no opinion from a treating or examining physician and the two agency physicians who reviewed the record came to different conclusions regarding the claimant's RFC.  *Id.* at 646.  The ALJ chose to credit the least-restrictive of the two opinions.  *Id.*  The court remanded the case so the ALJ could "conduct further inquiry as to what relevance Combs' being in 'no acute distress' and having 'normal movement of all extremities' [had] for her ability to function in the workplace."  *Id.* at 647.  Here, however, the ALJ did not rely on her own interpretation of cryptic treatment notes when assigning weight to competing opinions.  The treatment notes are not cryptic.  As the Commissioner notes, Claimant's objective medical tests were rather "unremarkable."  Even her MRI results prompted only injection therapy followed by possible spinal cord stimulator therapy.  In addition, although Claimant testified that she uses a cane every day and has done so for three years, the treatment notes in the record do not indicate that she uses an assistive device.  As discussed above, Claimant consistently had a steady gait and normal physical examinations.  In addition,

14

at her consulting psychiatric evaluation on January 5, 2017, Denise C. Valenti-Hein, Ph.D., included a thorough section called "Activities of Daily Living" that documented Claimant's self-reported physical activities and limitations and did not mention use of an assistive device. (*Id.* at 566.) Claimant did not even use a cane when she reported to Dr. Michael M. Nguyen for knee pain in December 2017 and January 2018. (*Id.* at 665-67, 674-77.)

In this case, the ALJ relied not only on the medical records, but also on the Claimant's daily and social activities to support her decision, which she found "reduced but supportive of a range of sedentary work activity." (*Id.* at 18.) Regarding her back pain, as discussed above, the ALJ found Claimant more limited than the state consulting physicians and that her "elevated BMI likely exacerbated her other impairments." (*Id.* at 20.)[4] The ALJ also noted that Claimant's most recent physical examination in February 2018 "documented normal gait, 5 of 5 strength in all muscle groups, intact sensation, intact reflexes and intact coordination." (*Id.*) The ALJ did, however, limit Claimant to a reduced range of sedentary work based on her pain complaints and reported limited activities of daily living. (*Id.*)

The Commissioner is correct that Claimant's strength, gait, and range of motion tests have consistently yielded normal results. In addition, even when Claimant had long medical appointments, the treatment notes do not mention Claimant needing to alternate between sitting and standing or problems sitting throughout the appointment. (E.g., AR at 677 (noting 65-minute appointment).) The exception is Claimant's consultative psychiatric examination where Dr. Velenti-Hein noted "normal posture, locomotion and

---

[4] When Claimant saw Michael M. Nguyen for a lipoma in her knee, he referred her for a bariatric surgery program. (*Id.* at 666.) When Claimant changed one of her medications, this change, alone, resulted in a ten-pound weight loss in six weeks, which Dr. Nguyen felt would take pressure off her knees and reduce her pain. (*Id.* at 666, 674.)

gait. She evidenced some difficulty with extended sitting and got up to pace at times."
(*Id.* at 567.) This, however, must be taken with a grain of salt given Claimant's tendency
to exaggerate her symptoms when presenting herself before those involved in deciding
her case, as will be discussed more below regarding Claimant's hand tremors. In
addition, the need to move occasionally is not necessarily inconsistent with sedentary
work and the limitations in the RFC.[5]

The ALJ stated that even after 2017, Claimant had normal gait, reflexes, strength,
and coordination. (*Id.* at 17, 20.) I have not found any treatment note where Claimant
mentioned or exhibited problems sitting for more than fifteen minutes other than the one
mention from Dr. Valenti-Hein. Claimant does not cite to any such treatment note. The
ALJ also considered Claimant's own adult function report and the third-party function
report of Claimant's mother-in-law, who also said Claimant had to lie down "several
times a day because her back hurts." (*Id.* at 19, 256.) The ALJ gave this report weight
to the extent it supported the RFC. (*Id.* at 19.)

Based on the record as a whole, I find that the ALJ's decision that Claimant's
"medically determinable impairments could reasonably be expected to cause the alleged
symptoms; however, [Claimant's] statements concerning the intensity, persistence and
limiting effects of these symptoms are not entirely consistent with the medical evidence
and other evidence in the record," and therefore the ALJ's decision regarding Claimant's
back pain should not be disturbed. (*Id.* at 16.) *See Hacker*, 459 F.3d at 936 (ALJ's
decision is not outside the acceptable zone of choice simply because the court might have
reached a different decision.). The only evidence in the record supporting a finding that

_____

[5] "Sedentary work involves sitting most of the time, but may involve walking or standing for
brief periods of time. Jobs are sedentary if walking and standing are required only occasionally
and all other sedentary criteria are met." U.S. Dept. of Labor, *DOT*,
https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC. HTM.

Claimant is limited by back pain to a degree that requires her to lie down periodically during the day are Claimant's and her mother-in-law's statements. Claimant, however, never relayed these concerns to her healthcare providers. Although no one doubts that Claimant has limitations due to back issues, Claimant has always had normal strength, gait, and coordination upon testing. Furthermore, Claimant does take issue with the ALJ's credibility determination.

Claimant states that her hand tremors developed after the date of the consulting physicians' opinions and that, assumedly, the record required development to include a medical opinion that addresses, among other things, this impairment. (Doc. 12 at 9.) The ALJ noted that Claimant sought treatment for hand tremors in December 2017. (AR at 17.) The Commissioner argues that Claimant's report that she

> developed hand tremors in September 2017 is of little significance because to secure benefits, a claimant must show she is unable to engage in any substantial gainful activity due to a medically determinable impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. . . . Plaintiff made the report of tremors less than 12 months before the relevant period expired, which fails the 12-month durational requirement for disability (Tr. 680). Further, the only finding on the day she made the report was a left finger twitch (Tr. 680). When plaintiff had an EMG to evaluate the tremor, it returned with a mild finding of median mononeuropathy of the left wrist and her nerve conduction study was normal (Tr. 661-663). The ALJ properly considered the minimal objective findings and normal diagnostic studies in finding the reported tremor was insignificant (Tr. 17, 661-663, 680).

(Doc. 13 at 11-12.)

Claimant responds that her tremors began two months before she presented to the physician for the problem on September 15, 2017. (Doc. 14 at 3 (citing AR 679).) Because Claimant was still complaining of tremors at her hearing in April 2018, Claimant argues that on the record, it "appeared that Ms. Ferrin's tremors would last for at least 12 months." (*Id.*)

Claimant is correct that she first presented to her physician complaining of tremors in September 2017 rather than in December 2017. She is not, however, correct that stating she had been experiencing tremors two months prior to that date will necessarily establish the onset of the symptoms for disability purposes. *See* Order adopting R. & R. at 6, *Teahen v. Comm'r of Soc. Sec.*, No. 18-CV-81-LRR (N.D. Iowa Feb. 18, 2020) (Doc. No. 20) (finding that January 2013 treatment note documenting "Neck pain–worsex1yr?" did not establish disability during the relevant time period that closed prior to January 2013 when, among other things, clinical findings at that appointment were normal). The case at bar can be distinguished from *Teahen*. In *Teahen*, the claimant did not receive treatment for neck pain at the appointment during which the claimant tried to establish his disability date. Because Claimant in this case was referred to neurology for evaluation of her hand tremors, I find that Claimant here, like the claimant in *Teahen* has failed to establish disability based on this impairment. (AR at 680.)

Claimant had an EMG nerve conduction test on February 22, 2018 that showed only "mild median mononeuropathy at the wrist on the left, i.e. carpal tunnel" and normal nerve conduction results. (*Id.* at 661.) Claimant was started on Primadone. (*Id.*) These are the most-recent treatment notes in the record. Thus, even assuming for purposes of this analysis that Claimant's tremors can be expected to last for twelve consecutive months, Claimant has not proven that her hand tremors are a disabling condition. [6] All physical problems do not rise to the level of disability. *See, e.g.*, *Guilliams*, 393 F.3d at 801 (a claimant's CFR is what the claimant can still do *despite* the limitations of his or

---

[6] I find that the ALJ did not base any decision regarding hand tremors on the length of time Claimant allegedly had this impairment. The ALJ never discussed whether Claimant had hand tremors for the required 12-month duration. Rather, the ALJ acknowledged the onset of the impairment, albeit during the incorrect month, and then analyzed the objective medical evidence and Claimant's testimony and other statements related to tremors and use of her hands. (AR at 17-19.) The ALJ rejected hand tremors as a severe impairment. (*Id.* at 12.)

18

her impairments); *Butler v. Astrue*, 242 F. App'x 373, 375 (8th Cir. 2007) (unpublished decision) (affirming ALJ's decision that record "supported only mild, not disabling, knee problem"). Here, the objective medical evidence shows normal nerve conduction test results and mild carpal tunnel symptoms, which are not related to Claimant's tremors. (AR at 661.) Claimant started conservative medication therapy for her hand tremors shortly before the hearing. She did not testify that she had returned to her physician in the two months between February 22 and April 18 seeking further medical attention or assistance and her attorney told the ALJ at the hearing that all medical records were submitted. (AR at 31.)[7] She did not seek additional treatment, in spite of describing tremors at the hearing that are now in both hands and are so bad that she "can't hold anything steady." (AR at 39.) *See Benskin v. Bowen*, 830 F.2d 878, 884 (8th Cir. 1987) (finding claimant's "failure to seek medical attention inconsistent with her complaints of pain"). Claimant also testified that her tremors are possibly early-onset Parkinson's disease, although her medical records state that her current symptoms are inconsistent with Parkinson's disease. (*Id.* at 39, 661.) The objective medical evidence, current conservative treatment, and Claimant's failure to seek medical attention for what she told the ALJ are increased symptoms undermine her claim that the tremors are a disabling condition.

It was Claimant's burden to establish disability and to provide medical evidence as to the severity of her impairments. *Kamann*, 721 F.3d at 950. Declaring extreme symptoms not supported by objective medical evidence and never reported to her physicians is insufficient. It is similarly not a reason to remand. Moreover, and more simply, Claimant has not established that her tremors lasted or would be expected to last

---

[7] Likewise, Claimant did not submit more medical records with her appeal to the Appeals Council. (AR at 1-5.)

for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). There are no documented tremors prior to September 2017, and even if I generously assume tremors began in July 2017, by the date of the hearing in April 2018, the tremors were only occurring for ten months. There are no treatment notes stating whether tremors would likely continue indefinitely, would be temporary, or would be resolved completely with treatment prior to July 2018. Thus, to assume tremors would last for twelve consecutive months is speculative.

In conclusion, although it is close, the record in this case is neither ambiguous nor inadequate "to allow for proper evaluation of the evidence." *Coleman*, 2013 WL 4069523, at *2 (citation omitted). Claimant has impairments, but she has consistently had a steady gait, adequate coordination, and full range of motion. The objective medical evidence related to her tremor shows normal results and Claimant is undergoing conservative treatment. Claimant's claims of debilitating tremors that have now spread to both hands are not credible because they are not supported in the record. The ALJ cited extensively to the record and included limitations in the RFC that addressed the limitations that are supported by evidence in the record. Upon this record, I find that no other opinion is needed. Therefore, under the deferential standard of review set forth above, I recommend the District Court affirm the ALJ's decision on this issue. *See Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

## B. *The ALJ improperly relied on the VE's testimony regarding other work Claimant could perform.*

To show that significant numbers of jobs exist that a person with the claimant's RFC can perform, an ALJ "may rely on a vocational expert's response to a properly formulated hypothetical question." *Sultan v. Barnhart*, 368 F.3d 857, 864 (8th Cir. 2004). However, "VE testimony that conflicts with the *DOT* [*Dictionary of Occupational*

*Titles*] does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform." *Moore v. Colvin*, 769 F.3d 987, 990 (8th Cir. 2014) (quotation omitted). "If there is an 'apparent unresolved conflict' between VE testimony and the *DOT*, the ALJ must 'elicit a reasonable explanation for the conflict' and 'resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the *DOT* information.'" *Id.* at 989-90 (quoting SSR 00-4p, 2000 WL 1898704, at **2-4) (brackets in original).

> SR 00-4p states:
>
>> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the *DOT*. In these situations, the adjudicator will:
>> -Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the *DOT*; and
>> -If the VE's . . . evidence appears to conflict with the *DOT*, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> SR 00-4p. Additionally, SSR 00-4p requires the ALJ to "explain in the determination or decision how he or she resolved the conflict." *Id.* Thus, SSR 00-4p essentially creates a tripartite duty upon the ALJ to inquire, resolve, and explain any conflict between the *DOT* and testimony from a VE.

*Closson v. Astrue*, No. C 06-4095-MWB, 2008 WL 504013, at *9 (N.D. Iowa Feb. 21, 2008).

Claimant argues that the ALJ did not resolve the apparent conflict between her RFC, which limits her to "'understanding, remembering and carrying out short, simple instructions' along with . . . limitations in 'responding appropriately to work pressures

21

in a usual work setting' and 'responding appropriately to changes in a routine work setting' and the Reasoning Level of 3." (Doc. 12 at 6.)

For support, Claimant cites *Zavalin v. Colvin*, 778 F.3d 842, 846-47 (9th Cir. 2015) for the proposition that the RFC's limitation to "simple and routine work tasks is inconsistent with level 3 reasoning." (Doc. 12 at 4.) Not only is *Zavalin* not binding precedent on this Court, but *Zavalin* also acknowledged the circuit split on this issue. 778 F.3d at 846 (citing *Terry v. Astrue,* 580 F.3d 471, 478 (7th Cir. 2009); *Renfrow v. Astrue,* 496 F.3d 918, 921 (8th Cir. 2007); *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005).) The Tenth Circuit finds a conflict between reasoning level 3 jobs and the limitation to simple routine work tasks. *Id.* The Seventh and Eighth Circuits do not. *Id.* The *Zavalin* court "join[ed] the Tenth Circuit [to] hold that there is an apparent conflict between the [RFC] to perform simple, repetitive tasks, and the demands of Level 3 Reasoning." *Id.* at 847.

Claimant notes that *Hackett*, the Tenth Circuit case cited by *Zavalin*, cited *Lucy v. Chater*, 113 F.3d 905 (8th Cir. 1997). *Lucy*, however, can be distinguished from the case at bar. In *Lucy*, the ALJ made contradictory statements regarding the claimant's intellectual abilities before concluding, without VE testimony, that the claimant had the capacity to engage in a full range of sedentary work. 113 F.3d at 908 (explaining that the ALJ found claimant had borderline intellectual functioning, that his "residual functional capacity for the full range of sedentary work [was] reduced by his borderline intellectual functioning," but that claimant could engage in a full range of sedentary work, even though that range encompassed jobs that required level 2 reasoning or higher). *Id.* at 908-09. The court remanded for the ALJ to call a vocational expert to respond to a hypothetical question that included the claimant's intellectual impairments. *Id.* at 909. Here, on the other hand, the ALJ relied on the testimony of a VE who responded to hypotheticals that included all the impairments the ALJ found supported by the record.

22

*See Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (ALJ need only include "those impairments that the ALJ finds are substantially supported by the record as a whole" in the hypothetical question).

Claimant also asserts there is a "split viewpoint" on this issue in this Court. (Doc. 12 at 5.) Claimant cites *Jennings v. Berryhill*, in which Chief Judge Strand accepted the report and recommendation of then-Chief Magistrate Judge Williams that there was an inconsistency between an RFC limiting the claimant to "simple, routine tasks with simple instructions" and a reasoning level 3 job. No. 3:17-cv-03062-LTS, 2018 WL 4107911 at *3 (N.D. Iowa August 29, 2018). The report and recommendation ("R. and R.") stated that "[a]lthough this tension is not dispositive of whether claimant is capable of performing the job of document preparer, the ALJ did not attempt to resolve this tension, and the record is otherwise unclear as to whether claimant could perform the job of document preparer." *Jennings v. Berryhill*, No. 17-CV-3062-LTS, 2018 WL 3656306, at *10 (N.D. Iowa Aug. 2, 2018), *R. & R. adopted*, No. C17-3062-LTS, 2018 WL 4107911 (N.D. Iowa Aug. 29, 2018). Therefore, the R. and R. concluded that "there is a possibility that claimant could perform the work of 'document preparer,' but the record is insufficient to determine whether claimant has the requisite reasoning level to perform the job." *Id.* at *12.

Claimant also cites *Murphy v. Comm'r of Soc. Sec.*, No. 18-CV-61-LRR, 2019 WL 2372896 (N.D. Iowa April 10, 2019), *appeal docketed*, No. 19-2202 (8th Cir. June 12, 2019), for the other side of the "split." In *Murphy*, the RFC limited the claimant to "simple, routine, and repetitive tasks." 2019 WL 2372896 at *6. Judge Linda R. Reade found, in pertinent part, that jobs requiring level 3 reasoning were not inconsistent with the RFC. *Id.* (relying on *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007)).

Chief Magistrate Judge Mahoney discussed these two cases in her report and recommendation in *Dighton v. Saul*, No. C18-57-LTS, 2019 WL 4731943 (N.D. Iowa

Sept. 27, 2019) (Judge Strand adopting the R. & R. in its entirety). In *Dighton*, the RFC was, as is the RFC in this case, more multi-faceted than those addressed in *Jennings* and *Murphy*, limiting the claimant, in pertinent part, to work involving "simple, routine and repetitive tasks . . . [with] only simple work-related instructions and decisions, and with only occasional judgment and work place changes." 2019 WL 4731943, at **4-5. Judge Mahoney concluded that it was unclear whether the additional RFC restrictions

> were comparable to the inability to perform complex technical work or to perform simple, non-detailed work, which courts have found are not in conflict with jobs requiring level three reasoning. *Id.* (citing *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) and *Filbert v. Colvin*, No. 4:14-cv-00209-JAR, 2015 WL 1474873, at *9-11 (E.D. Mo. Mar. 31, 2015)). She noted that the limitations taken together plainly exceeded restrictions of "simple, routine and repetitive tasks" or "simple, repetitive tasks" identified in other cases where courts have concluded such limitations are consistent with level two and level three reasoning. *Id.* at 14-15 (citing *Murphy v. Berryhill*, No. 18-CV61-LRR, 2019 WL 2372896, at *6 (N.D. Iowa Apr. 10, 2019) and *Hamer v. Colvin*, No. 4:14 CV 1371 JMB, 2015 WL 6750820, at *10 (E.D. Mo. Nov. 5, 2015)).

*Id.* at *5. Thus, Judge Mahoney reasoned that the issue appeared "unsettled and whether an inconsistency exists depends on the facts of each case." *Id.* Judge Mahoney concluded that any conflict between *DOT* job descriptions and the claimant's RFC was unexplained and therefore she concluded that the ALJ had relied on his professional knowledge, training, and experience to address restrictions not addressed in the *DOT*. *Id.* Judge Mahoney held that merely asking whether that the ALJ's testimony was consistent with the *DOT* did not address the claimant's ability to perform jobs requiring level 3 reasoning. *Id.* Because the ALJ failed to address the inconsistency between the claimant's RFC and reasoning level 3 jobs, and because there was no other evidence in the record such as past prior work to indicate the claimant could perform those jobs, Judge Mahoney

recommended the case be remanded to resolve the conflict. *Id.* Judge Strand accepted the R. and R. without modification on clear error review. *Id.* at **6-7.

I agree with *Dighton* that cases must be decided on their facts. And, on first blush, the RFC in the case at bar seems very similar to the *RFC* in *Dighton* because it mentions an instructions limitation, a work pressure limitation, and a change in workplace setting limitation, making this mental RFC more complicated than some of the mental RFCs addressed in previous cases. However, a closer reading of the RFC reveals the RFC only includes an instructions limitation.

The relevant part of the RFC provides the following: "Mentally, the claimant is limited to understanding, remembering and carrying out short, simple instructions. The claimant is limited to responding appropriately to work pressures in a usual work setting. The claimant is limited to responding appropriately to changes in a routine work setting." (AR at 14.) The parties have different interpretations of what the RFC says. Claimant asserts that the RFC limits her abilities *in* responding appropriately to work pressures in a usual work setting and responding appropriately to work pressures in a usual work setting. (Doc. 12 at 6.) The Commissioner argues that the RFC states Claimant can respond appropriately to work pressures in the usual work setting and to changes in a routine work setting. (Doc. 13 at 17.)

Although the way the RFC is written arguably leaves room for interpretation, I find that the Commissioner is correct. The parties agree that the first hypothetical the ALJ proffered at the hearing "somewhat resembled the ALJ's eventual RFC determination." (Doc. 9 at 4.) They also agree that "the [ALJ's] second hypothetical question [to the VE] became the ALJ's eventual RFC determination." In relevant part, the first hypothetical stated the following: "The individual is able to understand, remember, and carry out short, simple instructions; able to respond appropriately to work pressures in the usual work setting; and is able to respond appropriately in a routine work

setting." (AR at 51.) In the second hypothetical, the VE was asked to "assume an individual of Claimant's age, education, past work experience, who has the Residual Functional Capacity as identified in Hypothetical #1." (*Id.* at 52.) The ALJ then changed only some of the exertional limitations from the first hypothetical. (*Id.*) Based on this history and the RFC's lack of limitations beyond "appropriate responses," I find that the Commissioner is correct. The RFC does not limit Claimant's ability to respond appropriately to work pressures in a usual work setting or her ability to respond appropriately to changes in a routine work setting. This also distinguishes the case from *Dighton* because this case contains only an instruction limitation, and not an additional task limitation, work-place decisions limitation, and judgment limitation. *See Dighton,* 2019 WL 4731943, at **4-5.

This, however, does not end the inquiry. The inquiry now becomes whether an RFC requiring "short, simple instructions" is compatible with jobs requiring level 3 reasoning. Reasoning Development Levels 1-3 are described below:

- Level 1: Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
- Level 2: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.
- Level 3: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

DOT, App'x C, https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC. HTM.

The Commissioner argues that Claimant's RFC is compatible with level 3 reasoning:

While the *DOT*'s definition of level three reasoning also mentions potentially dealing with problems involving *several* concrete variables, the dictionary defines several as an indefinite number that is more than two and fewer than many. As such, several concrete variables in the context of level three reasoning could be as few as two and the ALJ's RFC restriction to short, simple instructions does not conflict with level three reasoning jobs involving *several* concrete variables.

(Doc. 13 at 18-19 (citing https://www.merriam-webster.com/dictionary/several) (emphasis in original).)

The Commissioner's argument fails for two reasons. First, the definition of "few," which is part of the definition of level 2 reasoning, is "not many but more than one." https://www.dictionary.com/browse/few?s=t. On a continuum from level 1 to level 3, "several" would logically encompass larger numbers than "few," and "few" seem to logically occupy the space after "one" in the hierarchy. Second, and more importantly, arguing that a definition of "several," which means "more than two," incorporates "as few as two" concrete variables is internally inconsistent. Therefore, both a commonsense reading and a literal reading of the definitions makes the Commissioner's argument untenable.

The cases cited by Commissioner are also distinguishable. *Renfrow v. Astrue*, held that jobs requiring level 3 reasoning were not inconsistent with an RFC that included an inability to do "complex technical work" because the jobs in question were "classified as unskilled and so [did] not appear to be 'complex.'" 496 F.3d 918, 921 (8th Cir. 2007). *Renfrow* did not address a particular "instructions limitation." Rather, the case turned on the meanings of "complex" and "unskilled." The dispute before the Court, however, is about whether an RFC limiting Claimant to short simple instructions is compatible with jobs requiring level 3 reasoning. Thus, *Renfrow* is not on point.

Likewise, *Hillier v. Soc. Sec. Admin.* is also distinguishable. Although the RFC in *Hillier* limited to the claimant to jobs with simple concrete instructions, the ALJ found

27

she could perform her past work as a cashier, which required level 3 reasoning. 486 F.3d 359, 367 (8th Cir. 2007). The court reasoned that the claimant's past work experience, in combination with the absence of any evidence showing any mental deterioration since she previously worked as a cashier showed that she had the mental capacity to perform the job of cashier. *Id.* Here, there is no evidence that Claimant's past work history qualifies her for work as a surveillance system monitor, order clerk, or credit clerk.

Judge Mahoney articulated the difference between the case at bar and *Welsh v. Colvin*, 765 F.3d 926 (8th Cir. 2014), also cited by the Commissioner, in the following way:

> In *Welsh*, the Eighth Circuit ultimately concluded that "[t]he failure to address any potential inconsistency between the RFC's limitation to simple, routine, repetitive work and the *DOT*'s requirement of level three reasoning does not require a remand," where the ALJ (on remand to resolve inconsistencies) had "thoroughly questioned the VE regarding her opinion." 765 F.3d at 927-28, 930. The VE had explained that "the *DOT* descriptions are maximum possible job requirements" and that the hypothetical person with claimant's limitations could adequately perform the job duties identified by the VE, despite the *DOT* stating they required level three reasoning. *Id.* at 929-30. Here, however, any conflict between the *DOT* and the VE's testimony went unexplained.

R & R at 12-13, *Dighton v. Saul*, No. 18-cv-57-LTS-KEM (N.D. Iowa Sept. 4, 2019) (Doc. 17).

Just as in *Dighton*, the ALJ in the case at bar never explained any conflict between the *DOT* and the VE's testimony. By asking if the VE's testimony was consistent with the *DOT* and its companion publication, the *SCO*,[8] (AR at 52-53), the ALJ did not address the relevant issue of whether level 3 jobs were consistent with an RFC limiting Claimant

---

[8] *Selected Characteristics of Occupations.*

to short simple instructions. *Moore*, 769 F.3d at 989–90 ("The ALJ is not absolved of [the] duty" to resolve any apparent unresolved conflict between VE testimony and the *DOT* merely because the VE responds, "Yes," when asked if his testimony is consistent with the *DOT*.) (citing *Kemp v. Colvin,* 743 F.3d 630, 633 (8th Cir. 2014)).

Finally, this case can be distinguished from *Murphy*, the case Claimant states is on one side of this Court's "split viewpoint." *Murphy* addressed RFC limitations on the claimant's ability perform "simple, routine, and repetitive *tasks*" rather than limitations on the instructions the claimant could comprehend. See 2019 WL 2372896 at *6. In fact, the R. and R. adopted in *Murphy* recognized that there were no instructions limitations. *See Murphy v. Berryhill*, No. 18-CV-61-LRR, 2019 WL 1140235, at *16 (N.D. Iowa Mar. 12, 2019) (noting that the ALJ did not include a specific number of "steps" in the RFC, a reference to a prior discussion of 1-to-2-step instructions), *R. & R. adopted sub nom Murphy v. Comm'r of Soc. Sec.*, 2019 WL 2372896 (N.D. Iowa April 10, 2019), *appeal docketed*, No. 19-2202 (8th Cir. June 12, 2019). This case is more analogous to *Jennings*, the case on the other side of the alleged split, because *Jennings* addressed not only a task limitation, but also an instructions limitation. 2018 WL 4107911 at *3. In addition, the ALJ in *Jennings* failed to resolve the tension between the claimant's mental RFC and a job requiring level 3 reasoning just as the ALJ in this case did. *Id.*

After a thorough analysis, I find that this this case should be remanded for the ALJ to resolve the apparent conflict between the limitation to short simple instructions and level 3 reasoning. On remand, the ALJ should elicit testimony from a vocational expert on this issue.

***C.      Claimant failed to timely raise her Appointments Clause argument under Lucia v. SEC.***

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that SSA ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. (Doc. 12 at 9-16.) Claimant asserts this Court should vacate the denial of benefits by ALJ Larsen and remand the case for decision by what she contends is a properly-appointed ALJ. (*Id.* at 9.) Claimant admits she is asserting this Appointments Clause challenge for the first time in her brief to this Court. (*Id.* at 10-15.)

Claimant argues that her case presents a difference from most of the other cases that I have previously addressed. On July 16, 2018, while Claimant's case was in the administrative process, then-Acting Commissioner of Social Security Berryhill ratified the appointments of all Social Security ALJs. (Doc. 32 at 13.) Claimant argues that Ms. Berryhill had no power to appoint the ALJs because "the Federal Vacancies Reform Act as it relates to temporary Department Heads may only be constitutional as it relates to temporary appointments, since a principal officer requires Senate confirmation." (Doc. 12 at 15 (citing *United States v. Eaton*, 169 U.S. 331, 343 (1898).) Claimant argues that Ms. Berryhill was an inferior officer who did not have the power to appoint other inferior officers, in this case, ALJs. (*Id.* at 15-16 (citing *NLRB v. SW Gen., Inc.* 137 S. Ct. 929, 946 (2017) (Thomas, J., concurring)).) Claimant asserts that because this issue "still needs addressed [sic] by the agency's first proper Commissioner in years," the Court

should exercise discretionary review of her Appointments Clause challenge, even though it was not timely raised during the administrative process.[9]

The Commissioner concedes that a Department Head is not a "principal officer" requiring Senate confirmation, but argues that Clamant cites no authority, and the Commissioner is unaware of any authority, "for the novel proposition that an acting Department Head is ineligible to exercise the appointment power." (Doc. 13 at 34.) According to the Commissioner, "there is a long history of acting officials serving as Department Heads and exercising the powers of their offices." (*Id.* (citing Office of Legal Counsel, DOJ, *Designating an Acting Attorney General*, at 2 (Nov. 14, 2018) https://www.justice.gov/olc/file/1112251/download ("As all three branches of government have long recognized, the President may designate an acting official to *perform the duties of a vacant principal office*, including a Cabinet office, even when the acting official has not been confirmed by the Senate.") (emphasis added); *id.* at 8-28 (surveying this history).)

The Federal Vacancies Reform Act provides the following:

(a) If an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--

(1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity . . . .;

(2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity. . .; or

---

[9] The Eighth Circuit has interpreted *Freytag v. Commissioner*, 501 U.S. 868 (1991), to allow a reviewing court the permission, though not the obligation, "to hear a belated appointments clause challenge." *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 795 (8th Cir. 2013).

> (3) notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity. . . .

5 U.S.C. § 3345. Thus, a plain reading of the Act gave Acting Commissioner Berryhill the authority to appoint ALJs because that is one of the "functions and duties" of the office she was fulfilling in her capacity as acting Commissioner of Social Security.

In addition, the two cases cited by Claimant are unhelpful to her argument. Claimant quotes *United States v. Eaton*, 169 U.S. 331, 334 (1898): "Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official." (Doc. 12 at 15.) *Eaton* addressed the appointment of a Vice Consul to Siam who was appointed by the Consul to Siam to perform the duties of the Consul when the Consul became too ill to fulfill his duties and returned to the United States. 169 U.S. at 332-33. *Eaton* did not address the duties that a temporarily-appointed inferior officer could perform. Rather, the case only addressed the time that a vice counsel performed the duties of consul, rather than the nature of the duties they were allowed to perform.

> Although section 2 of article 2 of the constitution requires consuls to be appointed by the president 'by and with the advice and consent of the senate,' the word 'consul' therein does not embrace a subordinate and temporary officer like that of vice consul, as defined in the statute. The appointment of such an officer is within the grant of power expressed in the same section, saying: 'But the congress may by law vest the appointment of such inferior officers, as they think proper, in the president alone, in the courts of law or in the heads of departments.' Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and

> the discharge of administrative duties would be seriously hindered. The manifest purpose of congress in classifying and defining the grades of consular offices, in the statute to which we have referred, was to so limit the period of duty to be performed by the vice consuls, and thereby to deprive them of the character of 'consuls,' in the broader and more permanent sense of that word.

*Id.* at 343. Therefore, nothing in *Eaton* prevented Ms. Berryhill from performing all the duties of the Commissioner while acting in that capacity. *Eaton* states that during the time the Vice Consul served as Consul, he was "charged with the performance of the duty of the superior," just as Ms. Berryhill was so charged in this case. Furthermore, the *Eaton* Court reasoned that the rule allowing for the appointment of a Vice Counsel under the circumstances presented in the case served the public interest and prevented closure of the consular office. *Id.* at 342-43. Similar goals are served here. If Ms. Berryhill was not authorized to ratify the appointments of sitting ALJs after *Lucia*, and her replacement was not yet nominated by the President and approved by the Senate, "evil consequences" would result. *Id.* at 342. All the work of the SSA would effectively be open to Appointments Clause challenges. This is an absurd result.

Claimant also cites *NLRB* where Justice Thomas wrote separately "to explain [his] view that the Appointment Clause likely prohibited [NLRB's general counsel's] appointment." 137 S. Ct. at 945. However, the portion of the concurrence quoted by Claimant addresses an issue the majority did not address and is not binding. *Id.* at 946.

Thus, none of Claimant's arguments convince me that the unique posture of this case requires remand. Moreover, Claimant failed to raise any of her arguments during the administrative process.

In support of her general argument that exhaustion is not required, Claimant cites SSR 19-1p, 2019 WL 1202036, Effect of the Decision in *Lucia v. Securities and Exchange Commission (SEC)* on Cases Pending at the Appeals Council. (*Id.* at 10.)

However, SSR 19-1p is inapplicable to Claimant's case because the ruling only applies to challenges timely raised before the Appeals Council or previously raised at the ALJ level. 2019 WL 1202036, at *9583; *see also Murphy*, 2019 WL 2372896, at *7 (addressing SSR 19-1p and holding that claimant waived *Lucia* issue when she raised it for the first time in the district court).

Claimant also cites *Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019), *affirmed*, *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, -- F.3d --, 2020 WL 370832 (3d Cir. Jan. 23, 2020); *Probst v. Berryhill*, No. 5:18-cv-130-JG, 2019 WL 1749135 (E.D.N.C. March 22, 2019), *appeal docketed*, *sub nom Probst v. Saul*, No. 19-1529 (4th Cir. May 17, 2019); and other non-binding cases and encourages the Court to adopt *Bizarre's* reasoning in this case. (Doc. 12 at 10.) The *Bizarre* court held that it did "not believe that [the claimant] was required to raise her [Appointments Clause challenge] before the ALJ or Appeals Council in the first instance or that failure to do so worked a forfeiture of that claim." 364 F. Supp. 3d at 425. I respectfully disagree and decline to adopt the *Bizarre* court's holding. Instead, I agree with the holding in *Murphy*: "[T]he court respectfully disagrees with the *Bizarre* court's holding. This court believes that failure to raise an Appointments Clause challenge before the ALJ or Appeals Council at the agency level waives the issue on judicial review at the district court level." 2019 WL 2372896, at *7 (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013); *Anderson v. Barnhart*, 344 F.3d 809, 814) (8th Cir. 2003)).

Furthermore, the recent decision in *Griffin v. Comm'r of Soc. Sec.* addressed the Third Circuit's decision in *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, -- F.3d --, 2020 WL 370832 (3d Cir. Jan. 23, 2020), and provided additional reasons why *Murphy* is still the better view. No. 18-CV-85-LRR, 2020 WL 733886 (N.D. Iowa Feb. 13, 2020).

> [I]n *Ramazetti v. Comm'r of Soc. Sec.*, No. 8:19-cv-260-T-MAP, 2020 WL
> 428950 (M.D. Fla. Jan. 28, 2020), the district court determined that the
> claimant's Appointments Clause challenge failed because the claimant
> waived the issue by not raising it before the ALJ or Appeals Council. *See*
> *id.* at *8. Further, the district court stated that "[t]he Supreme Court in
> *Lucia* did not make a blanket finding that all ALJs are subject to the
> Appointments Clause, just that SEC ALJs are so subject." *Id.* The district
> court points out that, "[a]t the time the Supreme Court decided *Lucia*, the
> SEC had only five ALJs. . . . In contrast, there are currently over 1,700
> Social Security Administration ALJs." *Id.* The district court also notes that
> "[t]he Social Security Administration annually receives about 2.6 million
> initial disability claims and completes about 689,500 ALJ hearings; in 2018,
> it took an average 809 days to process a claim from its initial receipt to an
> ALJ decision, with more than 850,000 people waiting for ALJ hearings."
> *Id.* The district court concluded that "[i]f courts were to apply *Lucia* to
> Social Security cases as Plaintiff argues this [c]ourt should, millions of cases
> would need [to] be remanded for rehearing by a different ALJ. Given these
> important efficiency concerns and the Supreme Court's specific findings in
> *Lucia*, the [c]ourt is skeptical that *Lucia* is even controlling as to Social
> Security Administration ALJs." *Id.* (quoting *Miaolino v. Comm'r of Soc.*
> *Sec.*, No. 2:18-cv-494-FtM-UAM, 2019 WL 2724020 (M.D. Fla. July 1,
> 2019)).

*Id.* at *10 (all alterations except first set of brackets in original).

This Court has ruled in favor of the Commissioner on similar claims on several

occasions. *See Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16

(N.D. Iowa Oct. 10, 2019); *Gilbert v. Saul*, No. C18-2045-LTS, 2019 WL 4751552, at

*20 (N.D. Iowa Sept. 30, 2019); *Squier v. Saul*, No. 18-CV-3026-LTS, 2019 WL

4696415, at *10 (N.D. Iowa Sept. 26, 2019); *Rollie v. Saul*, No. 18-CV-129-CJW-KEM,

2019 WL 4673220, at *10 (N.D. Iowa Sept. 25, 2019); *Dewbre v. Comm'r of Soc. Sec.*,

No. 18-CV-4055-LRR, 2019 WL 4344288, at *6 (N.D. Iowa Sept. 12, 2019); *Sexton v.*

*Saul*, No. C18-1024-LTS, 2019 WL 3845379, at *8 (N.D. Iowa Aug. 15, 2019); *Frazer*

*v. Saul*, No. C18-2015-LTS, 2019 WL 3776996, at *4 (N.D. Iowa Aug. 12, 2019);

*Murphy*, 2019 WL 2372896, at *7; *White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS,

2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

Finally, although Claimant argues that raising the issue during the administrative process would have been futile because Social Security EM-18003 prevented the ALJ from addressing the issue (Doc. 12 at 12-15), nothing stopped Claimant from raising the issue during the administrative process and preserving it for appeal or attempting to raise it in an amended appeal since *Lucia* was decided prior to the Appeals Council's decision in her case.[10]

However, because I recommend that Claimant's request for remand should be granted on other grounds, Claimant should be permitted to assert this objection on remand. *See Weatherman v. Berryhill*, No. 5:18-CV-00045-MOC, 2018 WL 6492957, at *4 (W.D.N.C. Dec. 10, 2018); *Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL

---

[10] Claimant urges the Court to stay decision on this issue pending the Eighth Circuit's resolution of the issue. (Doc. 12 at 10 (citing, *inter alia*, Order, *Trimble v. Comm'r, SSA,* No. 8-18-cv-162 (D. Neb. Feb 8, 2019).) In addition to the precedent cited by Claimant, I am also aware of the Honorable Rebecca Goodgame Ebinger's decision to stay her decision on this issue pending the Eighth Circuit's decision on this issue. Order at 5, *Harwell v. Saul*, No. 4:18-cv-00296-RGE-HCA (S.D. Iowa Mar. 2, 2020) (Doc. 24). Furthermore, I am mindful of the recent decision in *Wang v. Saul*, No. 18-cv-3144 (DTS) (D. Minn. Feb. 28, 2020), in which the Honorable David T. Schulz "decline[d] to follow the decisions in this District and those of the district courts within the Eighth Circuit that impose an exhaustion requirement upon Appointments Clause claims concerning SSA ALJs." Order at 14, *Wang*, No. 18-cv-3144 (DTS) (Doc. 23). In making my recommendation, I respectfully decline to follow these decisions. *See* Order at 12-13, *Dewbre v. Comm'r, Soc. Sec.*, No. 18-cv-4055-LRR-KEM (N.D. Iowa Sept. 12, 2019) (Doc. No. 17).

6421725, at *8 (D. Neb. Dec. 6, 2018); *Clayton C. v. Comm'r of Soc. Sec.*, No. C18-638 BHS-BAT, 2018 WL 5985255, at *4 (W.D. Wash. Oct. 16, 2018), *R. & R. adopted sub nom, Christianson v. Berryhill*, 2018 WL 5962899 (Nov. 14, 2018). Relying on *Mann*, this Court has noted, "[O]n remand, a claimant may challenge an ALJ's appointment because Appointments Clause challenges are deemed to be in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Anderson v. Comm'r of Soc. Sec.*, No. 18-CV-24-LRR, 2019 WL 1212127, at *5 (N.D. Iowa Feb. 19, 2019) (internal quotations omitted). If, however, the District Court declines to remand the case, this argument should be deemed waived.

## IV.   CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **reverse and remand** the decision of the ALJ with instructions to order VE testimony regarding inconsistencies between Claimant's RFC and level 3 reasoning and to allow Claimant to assert her Appointments Clause challenge on remand.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as

well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 8th day of April, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa